**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**CENTRAL DIVISION**

**LEAH ZORNES**                                                                                    **PLAINTIFF**


**v.**                                    **Case No. 4:19-cv-00474-LPR**


**THOMPSON TRANSPORTATION INC,** *et al.*                               **DEFENDANTS**

## ORDER

Plaintiff Leah Zornes sues her former employers, Thompson Transportation, Inc. ("Thompson Transportation"), Expedite Logistics ("Expedite"), and Jimmy Thompson (collectively "the Defendants") for violating the Fair Labor Standards Act ("FLSA") and Arkansas Minimum Wage Act ("AMWA"). She alleges that Defendants violated the FLSA and AMWA by failing to pay her overtime wages. On April 13, 2020, Defendants moved for summary judgment.[1] For the reasons discussed below, Defendants' Motion for Summary Judgment is GRANTED in its entirety.

## Summary Judgment Standard

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[2] Conversely, if the nonmoving party can present specific facts by "affidavit, deposition, or otherwise, showing the existence of a genuine issue for trial," then summary judgment is not appropriate.[3] It is important to understand that "[t]he mere existence of a factual dispute is insufficient alone to bar summary judgment."[4] To

---

[1]    Defs.' Mot. for Summ. J. (Doc. 19).

[2]    FED. R. CIV. P. 56(a).

[3]    *Grey v. City of Oak Grove, Mo*., 396 F.3d 1031, 1034 (8th Cir. 2005).

[4]    *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989) (citation omitted).

prevent summary judgment, the dispute of fact must be both genuine and material.[5]  A genuine dispute of fact exists where a rational jury could decide the particular question of fact for either party.[6]  A material dispute of fact exists where the jury's decision on the particular question of fact determines the outcome of a potentially dispositive issue under the substantive law.[7]

The moving party has the burden of showing that (1) there is an absence of a genuine dispute of material fact on at least one essential element of the nonmoving party's case and (2) the absence means that a rational juror could not possibly find for the nonmoving party on that essential element of the nonmoving party's case.[8]  If the moving party meets that burden, the burden then shifts to the nonmoving party to show that there is a genuine dispute of material fact.[9] The nonmoving party meets this burden by designating specific facts in affidavits, depositions, answers to interrogatories, admissions, or other record evidence that shows "there is a genuine issue for trial."[10]  The Court must view the evidence in the light most favorable to the nonmoving party and give the nonmoving party the benefit of all reasonable inferences.[11]  Accordingly, for purposes of the Motion here, the Court considers the most pro-plaintiff version of the record that a reasonable jury could rationally conclude occurred.

---

[5]   *Id.*

[6]   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[7]   *Id.*

[8]   *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

[9]   *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87 (1986); *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011).

[10]   *Celotex Corp.*, 477 U.S. at 322-24.

[11]   *Pedersen v. Bio-Med. Applications of Minn.*, 775 F.3d 1049, 1053 (8th Cir. 2015).

**Factual Background**

There are three defendants in this case: Thompson Transportation, Expedite, and Jimmy Thompson.  Mr. Thompson owns and operates both Thompson Transportation and Expedite.[12] Thompson Transportation is a trucking company that transports goods and Expedite is a cargo brokerage company that coordinates the transportation of goods.[13]  Thompson Transportation and Expedite share the same office space.[14]

Ms. Zornes worked for Defendants from December of 2004 until May of 2019.[15]  She worked as a freight broker, coordinating logistics for trucks.[16]  Her duties included checking load statuses, communicating with carriers about drivers, transit issues, posting loads available for haul, and dispatching new loads.[17]  She also called customers to get new business and did all of her customer billing and data entry.[18]  Ms. Zornes communicated with the carriers, drivers, and customers by phone, email, and text message.[19]

Expedite and Thompson Transportation's method of payment for Ms. Zornes's work was not simple.  Thompson Transportation paid Ms. Zornes what she calls a "draw" of $1,050 per week.[20]  Expedite, on the other hand, paid Ms. Zornes in commissions, based on the monthly profits she made for Expedite.[21]  Her weekly draw of $1,050 from Thompson Transpiration was

---

[12]   Ex. 1 to Defs.' Mot. for Summ. J. (Doc. 19-1) ¶¶ 2, 4.

[13]   Pl.'s Resp. to Defs.' Statement of Fact (Doc. 24) ¶ 3; Ex. 1 to Defs.' Mot. for Summ. J. (Doc. 19-1) ¶¶ 3, 5.

[14]   Pl.'s Resp. to Defs.' Statement of Fact (Doc. 24) ¶ 4.

[15]   *Id.* ¶ 1.

[16]   *Id.* ¶ 2.

[17]   Ex. 2 to Pl.'s Resp. in Opp'n to Defs.' Mot. for Summ. J. (Doc. 23-2) at 2.

[18]   *Id.*

[19]   *Id.*

[20]   Ex. 2 to Defs.' Mot. for Summ. J. (Doc. 19-2) at 192:13-23.

[21]   Pl.'s Resp. to Defs.' Statement of Fact (Doc. 24) ¶ 5.

deducted from the total profits figure prior to the calculation of the commissions.[22]  In 2016, Ms. Zornes earned $68,447.22 from Thompson and $57,110 from Expedite.[23]  In 2017, Ms. Zornes earned $50,485.19 from Thompson and $73,040.02 from Expedite.[24]  In 2018, Ms. Zornes earned $53.099.52 from Thompson and $84,727.35 from Expedite.[25]  In total from both Thompson and Expedite, Ms. Zornes earned $125,557.22 in 2016, $123,525.21 in 2017, and $137,826.87 in 2018.[26]

Ms. Zornes's last day of employment with Defendants was May 16, 2019.[27]  On July 8, 2019, she brought this lawsuit for lack of overtime pay.[28]  As Ms. Zornes concedes, the claims in this case are subject to a three-year statute of limitations.[29]  Accordingly, the relevant time period at issue in this case starts on July 8, 2016 and runs through Ms. Zornes's last day of work for Defendants on May 16, 2019.  Ms. Zornes claims that she was not paid overtime despite working well over forty (40) hours per week nearly every week during this three-year period.[30]  Defendants dispute that Ms. Zornes ever worked over forty hours in a week during this three-year period.[31]  Mr. Thompson adds (in the alternative) that neither he nor anyone else employed by Defendants

---

[22]   Ex. 2 to Defs.' Mot. for Summ. J. (Doc. 19-2) at 192:13-23.  Ms. Zornes describes the pay process as follows: "I would have to deduct my Thompson salary from the profit that I made on the Expedite side in order to cover my salary of 1,050 a week. So, for instance, if I made $3,000 profit, I would automatically have to deduct 1,050, which is my salary, from that $3,000, and I got profit, commission percentage from the remaining amount; 3,000 minus 1,050 is an example."  *Id.*

[23]   Ex. 3 to Defs.' Mot. for Summ. J. (Doc. 19-3) at 1; Ex. 4 to Defs.' Mot. for Summ. J. (Doc. 19-4) at 1.

[24]   Ex. 3 to Defs.' Mot. for Summ. J. (Doc. 19-3) at 2; Ex. 4 to Defs.' Mot. for Summ. J. (Doc. 19-4) at 2.

[25]   Ex. 3 to Defs.' Mot. for Summ. J. (Doc. 19-3) at 3; Ex. 4 to Defs.' Mot. for Summ. J. (Doc. 19-4) at 3.

[26]   Ex. 3 to Defs.' Mot. for Summ. J. (Doc. 19-3) at 1-3; Ex. 4 to Defs.' Mot. for Summ. J. (Doc. 19-4) at 1-3.

[27]   Pl.'s Resp. to Defs.' Statement of Fact (Doc. 24) ¶ 2; Ex. 1 to Defs.' Mot. for Summ. J. (Doc. 19-1) ¶ 25.

[28]   Pl.'s Compl. (Doc. 1).

[29]   Pl.'s Am. Compl. (Doc. 15) ¶ 43.  The FLSA imposes a two-year statute of limitations for violations; the time period is extended to three years for willful violations of the FLSA.  29 U.S.C. § 255(a).

[30]   Pl.'s Am. Compl. (Doc. 15) ¶ 41.

[31]   Thompson Transportation's Answer (Doc. 17) ¶ 41; Expedite and Jimmy Thompson's Answer (Doc. 18) ¶ 41.

knew or believed that Ms. Zornes was working over forty hours per week.[32]   Defendants did not

track the hours Ms. Zornes worked.[33]   Ms. Zornes also did not record her hours.[34]

### A. Hours Worked

During 2016 through sometime in 2017, Ms. Zornes worked regularly in the office.[35]   The

Defendants' office was generally open from 7:00 a.m. to 4:00 p.m.[36]   Ms. Zornes did not have a

key to the office.[37]   At her deposition, Ms. Zornes testified that she would arrive at the office

between 7:30 a.m. and 8:00 a.m., and sometimes later.[38]   She testified she would generally leave

around 4:00 p.m.[39]   She testified that she sometimes went to lunch and sometimes did not, but

often worked during "lunch time" even if she went lunch.[40]   Sometime in 2017, due to Ms. Zornes's

personal health issues and her husband's health issues, Mr. Thompson gave Ms. Zornes a laptop

that enabled her to work from home.[41]   Ms. Zornes explained that she could perform many of her

work duties from her cellphone but that she needed computer access to satisfy all of her duties.[42]

Ms. Zornes testified that she did not go to the office every day after she received the laptop to work

---

[32]   Ex. 1 to Defs.' Mot. for Summ. J. (Doc. 19-1) ¶ 16.

[33]   *Id.* ¶¶ 15-16.

[34]   Ex. 2 to Defs.' Mot. for Summ. J. (Doc. 19-2) at 144:16-145:9.

[35]   Ms. Zornes could not identify the precise month or time of year in 2017 when she received a laptop from Mr. Thompson and started working remotely.  Ex. 2 to Defs.' Mot. for Summ. J. (Doc. 19-2) at 125:21-126:11.  Ms. Zornes provided a time log showing when she accessed her work computer from the laptop.  Ex. 4 to Pl.'s Resp. in Opp'n to Defs.' Mot. for Summ. J. (Doc. 23-4).  The earliest date on that log is December 1, 2017.  *Id.* at 22. Logically, the Court can assume that December 1, 2017 is the likely start date of her remote work.  However, the Court observes that date is not specifically identified by the parties on the record.

[36]   Pl.'s Resp. to Defs.' Statement of Fact (Doc. 24) ¶ 8.

[37]   *Id.* ¶ 9.

[38]   *Id.* ¶ 8.

[39]   Ex. 2 to Defs.' Mot. for Summ. J. (Doc. 19-2) at 98:6-25.

[40]   *Id.* at 100:16-102:4.

[41]   *Id.* at 122:12-126:16.

[42]   *Id.* at 126:12-128:15.

from home.[43]  She did testify, however, that she continued to work the same hours, including (but not limited to) all normal business hours.[44]  She just often did the work from home instead of the office.[45]

Critical to this case is Ms. Zornes's contention that she spent time (indeed, a good deal of time) working before and after normal business hours.  In her Amended Complaint, she alleged that she "was required to work from the time the phone rang in the morning until the last phone call in the evening, whether she was in the office or not."[46]  In her deposition, she testified that she frequently took client calls before or after regular business hours and on weekends.[47]  Ms. Zornes described herself as being "on call" at any time of day for drivers, carriers, customers, and delivery recipients.[48]  She testified that she could receive calls as early as 6:00 a.m. and as late as midnight.[49]  Ms. Zornes testified that she usually worked "until at least 8:00, 9:00 at night[, which] would be well after [she] had left the office."[50]

According to Ms. Zornes, in basically every week of this almost three-year period, she worked more than forty hours.[51]  How much over forty hours has been something of a moving target.  In her Amended Complaint, Ms. Zornes did not allege a specific number of weeks in which

---

43   *Id.* at 124:6-8.

44   *Id.* at 103:13-104:20.

45   *Id.* at 105:17-106:8.

46   Pl.'s Am. Compl. (Doc. 15) ¶ 29.

47   Ex. 2 to Defs.' Mot. for Summ. J. (Doc. 19-2) at 163:10-16.

48   *Id.* at 163:18-23.

49   Ex. 2 to Pl.'s Resp. in Opp'n to Defs.' Mot. for Summ. J. (Doc. 23-2) at 2.

50   Ex. 2 to Defs.' Mot. for Summ. J. (Doc. 19-2) at 163:10-13.

51   *Id.* at 144:6-15.  When Ms. Zornes was asked to specify particular weeks when she worked overtime, Ms. Zornes's response was essentially "all of them."  *Id.*  She did not identify particular weeks nor explain how and why she specifically recalls working over forty hours on those weeks.  *Id.* at 144:6-22.  At her deposition, Ms. Zornes acknowledged she may have worked less than forty hours per week during a few weeks around Christmas (and also maybe around Thanksgiving) each year.  *Id.* at 53:1-54:14.

she worked over forty hours, nor did she allege a specific number of hours worked over forty. Instead, she alleged that she "was required to work an average number of hours each week that exceeded forty (40)."[52]  In her initial disclosures, when asked to provide a computation of damages, Ms. Zornes did not state a specific number of weeks in which she worked over forty hours, nor did she allege a specific number of hours worked over forty.  Instead, she stated that she was "owed an overtime premium . . . for each hour worked over forty (40) in any each workweek . . . ."[53]  She provided no computation of damages.  In response to an Interrogatory, Ms. Zornes "estimate[d] that she worked between 45 and 70 hours each week."[54]  At her deposition, Ms. Zornes estimated that on average she worked fifty-five (55) hours per week during the three-year period.[55]  Most recently, in a pre-trial disclosure sheet, Ms. Zornes stated that she "estimates she worked an average of fifty (50) hours per week."[56]

What exactly these estimates represent is also not entirely clear from the record.  For example, at one point in her deposition testimony, Ms. Zornes stated that her fifty-five-hour estimate *included* one full day of weekend work a month (because she recalls working an average

---

[52]   Pl.'s Am. Compl. (Doc. 15) ¶ 28.

[53]   Ex. 6 to Defs.' Reply (Doc. 27-6) at 2.

[54]   Ex. 2 to Pl.'s Resp. in Opp'n to Defs.' Mot. for Summ. J. (Doc. 23-2) at 1.  Ms. Zornes noted that she was making this estimate "[w]ithout the benefit of any records." *Id.*

[55]   Ex. 2 to Defs.' Mot. for Summ. J. (Doc. 19-2) at 141:21-142:21, 162:22-163:8, 164:2-6, 166:6-16, 170:21-171:12, 174:3-175:3, 176:19-25; Dep. of Leah Zornes (Doc. 53) at 139:11-23.  It appears that counsel for Defendants—and not Ms. Zornes—was the first person to mention the fifty-five-hour figure.  Dep. of Leah Zornes (Doc. 53) at 139:11-12.  Counsel's question suggested that Ms. Zornes stated the fifty-five-hour figure in her Amended Complaint.  That's inaccurate, as the Amended Complaint does not use the fifty-five-hour figure. Notwithstanding this, Ms. Zornes's statements at her deposition suggests that she adopted the fifty-five-hour estimate as her own.  *See, e.g.*, Ex. 2 to Defs.' Mot. for Summ. J. (Doc. 19-2) at 162:22-164:3.  And subsequently, in the Response to the Motion for Summary Judgment, Ms. Zornes expressly refers to the fifty-five-hour estimate as "her estimation."  Pl.'s Resp. in Opp'n to Defs.' Mot. for Summ. J. (Doc. 23) at 14 ("Plaintiff has provided a full explanation for her estimation that she worked 55 hours per week. . . . Though her weeks were more often 60-70 hours of work each week, Plaintiff acknowledged that she would have deductions between the first call she received in the morning and the last call she took at night, added in her average weekend hours, and estimated 55 hours a week for the entire statutory period.").

[56]   Pl.'s Pretrial Disclosure Sheet (Doc. 36) at 3.

of two hours or so every weekend).[57]  However, earlier in her deposition she said that her estimate *excluded* all weekend work.[58]  Subsequent to her deposition, in her summary judgment papers, Ms. Zornes said that her fifty-five-hour estimate did in fact *include* weekend work.[59]  Most recently, in her pre-trial disclosure sheet where she lowered her estimate to fifty hours worked per week, Ms. Zornes did not state whether this includes or excludes weekend work.[60]

For another example, at one point in her deposition testimony, Ms. Zornes stated that her estimate *included* time (outside of normal business hours) where she was simply waiting for a response:

> . . . I guess I didn't exclude the hours just because if I was waiting in reference to an issue—[a]n issue being anything relating to a load, and I was waiting on a call back or a correspondence back from someone in regards to that matter; let's just say that load.  I was waiting for some kind of response back on something—then I considered myself still working until that was completely done.[61]

Later in her deposition, Ms. Zornes said that her estimate reflected "any deductions of time for whatever reason."[62]  And in her Response, Ms. Zornes said that the fifty-five-hour estimate "acknowledged that she would have deductions between the first call she received in the morning and the last call she took at night."[63]  But it is unclear if those deductions are only referencing things like doctor visits, mealtimes with kids, etc., or if the deductions also include the waiting time Ms. Zornes first spoke about in her deposition.

---

[57]   Ex. 2 to Defs.' Mot. for Summ. J. (Doc. 19-2) at 162:22-163:23.

[58]   *Id.* at 142:17-21.

[59]   Pl.'s Resp. in Opp'n to Defs.' Mot. for Summ. J. (Doc. 23) at 14.

[60]   Pl.'s Pretrial Disclosure Sheet (Doc. 36) at 3.

[61]   Dep. of Leah Zornes (Doc. 53) at 138:6-15.

[62]   Ex. 2 to Defs.' Mot. for Summ. J. (Doc. 19-2) at 142:17-21.

[63]   Pl.'s Resp. in Opp'n to Defs.' Mot. for Summ. J. (Doc. 23) at 14.

For a third example, in her deposition, Ms. Zornes first said that her estimate did not exclude time for things like doctor's visits, dentist appointments, picking up her kids, being sick, going on her kids' field trips, etc., because she "still worked" during those times.[64]  Similarly, Ms. Zornes testified that there were times in 2018 when she stayed home because she had "stomach problems" that were so severe as to cause her to be "doubled over in stomach cramps," and left her physically unable to move.[65]  But she testified that on those days she worked the same hours as normal days.[66]  After being pressed about various non-work activities, Ms. Zornes testified:

> Actually, 55 hours is reduced, if you really want to know the truth. So, I approximately came up with 55 hours because I thought that would be in the best interest of [the Defendants] instead of down to the minute, which is probably closer to, like, 60 or 70 hours considering that I always worked until about eight or nine o'clock just about every day.
>
> . . . .
>
> Fifty-five hours is including any deductions of time for whatever reason.  I thought that was in the best interest at 55 hours because that was approximate, and that's not even including weekends that I worked as well.[67]

As noted above, Ms. Zornes has more recently (in her pre-trial disclosure), determined that the estimate should be reduced from fifty-five-hours to fifty-hours.[68]

### B. Support for Ms. Zornes's Contentions

Ms. Zornes did not provide any affidavits from colleagues who could testify to when she was in the office.  Nor did she provide any affidavits of individuals from her home-life that could

---

[64]  Dep. of Leah Zornes (Doc. 53) at 139:5-140:15 (worked when she was sick), 140:16-21 (when her husband was sick), 140:22-25 (during doctor appointments), 141:1-9 (during dentist appointments), 140:8-9 (at her kids' school), 166:17-167:24 (during her kids' field trip), 187:1-9 (working instead of picking up her kids from school).

[65]  Ex. 2 to Defs.' Mot. for Summ. J. (Doc. 19-2) at 102:15-103:12.

[66]  *Id.* at 103:13-21.

[67]  *Id.* at 142:5-14.

[68]  Pl.'s Pretrial Disclosure Sheet (Doc. 36) at 3.

testify to the timing and frequency of her work outside of the office.  Ms. Zornes testified that it would not be possible to determine or estimate how many hours she worked in a particular week by looking at objective facts such as how many loads she had to coordinate.[69]  Ms. Zornes also testified that her various job functions were not done in a linear fashion and often took different increments of time every day or week.[70]  She could not separately estimate how much time each job function took each day or each week.  As a result, there is really no good way to estimate Ms. Zornes's time apart from her own general recollection.

During discovery—particularly at her deposition—Ms. Zornes emphasized that cell phone records would back up her testimony about taking calls before and after normal working hours.[71]  She said she either had some of these cell phone records or had the ability to access to them.[72]  And she said the rest could be obtained by the legal process.[73]  Despite this, Ms. Zornes has not provided the Court with any cell phone records to show the time, frequency, and duration of work-related phone calls.[74]

Ms. Zornes also said that she had text messages that would support her testimony regarding regularly working outside of normal hours during the nearly three-year period at issue in this case.[75]  Ultimately, Ms. Zornes provided only nine pages of screenshots of text messages between

---

[69]   Ex. 2 to Defs.' Mot. for Summ. J. (Doc. 19-2) at 51:9-57:18, 69:7-24, 166:1-171:12.

[70]   *Id.* at 51:9-57:18.

[71]   *Id.* at 57:19-62:22, 64:14-66:14, 69:2-24, 143:6-11, 144:16-22, 146:22-150:22, 177:1-13; Dep. of Leah Zornes (Doc. 53) at 138:9-139:4.

[72]   Ex. 2 to Defs.' Mot. for Summ. J. (Doc. 19-2) at 58:2-63:20.

[73]   *Id.* at 66:15-67:16.

[74]   At oral argument on the Motion for Summary Judgment, Ms. Zornes's counsel appeared to suggest that, after the summary judgment deadline had passed, Ms. Zornes obtained all or a portion of the relevant cell phone records and turned them over to Defendants.  Tr. at 31-33.  Ms. Zornes could have asked for an extension of those deadlines or could have requested leave to supplement her summary judgment filings with the cell phone records.  She did not do so.

[75]   Ex. 2 to Defs.' Mot. for Summ. J. (Doc. 19-2) at 65:19-66:4, 69:2-9, 148:20-149:13, 150:3-22.

herself and Mr. Thompson.[76]  Of those, only one text message showed Ms. Zornes sending a work-related text message to Mr. Thompson after regular business hours.[77]  On October 28, 2018, Ms. Zornes wrote to Mr. Thompson at 7:52 p.m., "Hey Jimmy sorry if it's kinda late… Tim@ RL Smith is asking if he can drop 1 of his trailers around 5-6a[m] in the morning? Thx so much[.]"[78]  Mr. Thompson replied at 8:04 p.m., "Yeah that's fine, I'll text Robert and let him know[.]"[79]  The rest of the text messages appeared to be within regular business hours.[80]

The record in this case does include a time log showing when Ms. Zornes logged-in remotely to access her office desktop from her laptop.[81]  The time log spans from December 1, 2017 to May 16, 2019.[82]  It shows that (for the date range just noted) Ms. Zornes spent an average of 7.39 hours per week accessing her work computer.[83]  The highest number of hours worked in one week was 30.08 for the week of December 3-7, 2018.[84]  The next highest number of hours per week was 22.52, followed by 20.32, and 20.08.[85]  After that, the remaining seventy-three (73) recorded weeks all showed less than twenty-hours recorded.  The median of the hours recorded was 6.62 hours per week.  Ten weeks showed less than one hour for the week.[86]

---

[76]   Ex. 6 to Defs.' Mot. for Summ. J. (Doc. 19-6).  There were thirty-two total messages over the nine pages of screenshots.

[77]   *Id.* at 5.

[78]   *Id.*

[79]   *Id.*

[80]   *Id.* at 1-9.

[81]   Ex. 4 to Pl.'s Resp. in Opp'n to Defs.' Mot. for Summ. J. (Doc. 23-4).

[82]   *Id.*

[83]   *Id.*

[84]   *Id.* at 10.  No time was logged on the weekend for that week.

[85]   Ms. Zornes worked 22.52 hours for the week of November 25-December 1, 2018.  *Id.* at 11.  She worked 20.32 hours for the week of April 28-May 4, 2019.  *Id.* at 2.  And she worked 20.08 hours for the week of February 4-10, 2018.  *Id.* at 20.

[86]   *Id.*  The full weeks with less than one hour recorded are the weeks of October 14-20, 2018 (0.87 hours), September 2-8, 2018 (0 hours), August 5-11, 2018 (0.28 hours), July 29-August 4, 2018 (0.9 hours), July 15-21, 2018 (0.93

The time log does show that Ms. Zornes sometimes logged in to her computer in the evenings after regular business hours and sometimes in the early mornings before regular business hours.  On occasion, the time log shows that Ms. Zornes accessed her computer early in the morning and late at night on the same day.  For example, on December 18, 2018, Ms. Zornes accessed her computer at 7:31 a.m. for ten (10) minutes, at 5:29 p.m. for forty-three (43) minutes, and at 9:15 p.m. for forty-eight (48) minutes.[87]  The time log also shows that there were occasions where Ms. Zornes was logged-in during normal working hours and outside of normal working hours on the same day.  For example, on May 2, 2019, Ms. Zornes logged in at 8:18 a.m. for two hours and five minutes, and then again at 7:44 p.m. for two hours and twenty-five minutes.[88]  Finally, the time log shows that Ms. Zornes accessed her computer on some weekends.

### C.  Defendants' Knowledge of the Hours that Ms. Zornes Worked

In his affidavit, Mr. Thompson said that he believed that freight brokers like Ms. Zornes did not perform services on a strict schedule and that Ms. Zornes, "in particular, had flexible hours to perform freight brokerage services."[89]  He said that he did not know or think Ms. Zornes worked forty hours per week, or more than forty hours per week.[90]  Mr. Thompson did not set strict or explicit working hours during which Ms. Zornes was required to perform work for Defendants.[91]  Nonetheless, Ms. Zornes believed she was generally required to—and Mr. Thompson expected her to—work *at least* during normal working hours (8:00 a.m. to 4:00 p.m.).[92]  She testified that,

---

hours), July 8-14, 2018 (0.73 hours), February 18-24, 2018 (0.62 hours), December 24-30, 2017 (0.53 hours), December 10-16, 2017 (0.25 hours), December 3-9, 2017 (0 hours).

[87]  *Id.* at 9.

[88]  *Id.* at 2.

[89]  Ex. 1 to Defs.' Mot for Summ J. (Doc. 19-1) ¶ 10.

[90]  *Id.* ¶ 16.

[91]  Ex. 2 to Defs.' Mot. for Summ. J. (Doc. 19-2) at 114:1-7.

[92]  *Id.* at 103:13-104:2, 104:21-105:16, 114:1-7, 189:12-190:6.

after she was given the laptop, Mr. Thompson could tell what hours she was working by looking at when she was logging in remotely to her office desktop from her laptop.[93]

In her summary judgment papers, Ms. Zornes stated that "Mr. Thompson was aware of the hours [she] was working because [she] informed him of her work on an almost-daily basis."[94] To support that statement, Ms. Zornes cited to pages 164 and 165 of her deposition. But that portion of the deposition does not say that Ms. Zornes informed Mr. Thompson of her hours on a daily basis. Rather, having been asked whether she ever told Mr. Thompson that she was "working more than 40 hours in a work week," Ms. Zornes gave an answer that was far from unequivocal. She testified as follows:

> Well, it was brought up on several occasion [sic], "I don't know how you do it, Leah, but you're doing great. Continue what you're doing." Whether I was at the office or working from home and how many hours that I worked, "I don't know how you're doing it. Continue what you're doing. You're going great."[95]

She also testified that she never complained to Mr. Thompson about working over forty hours a week—although the context makes it unclear whether she is saying she never told Mr. Thompson this was happening or simply that she never "complained" about it.[96]

The bottom line here is that there is no testimony that Ms. Zornes told Mr. Thompson (either on a daily or weekly basis) how many hours she was working. Ms. Zornes testified that she brought Mr. Thompson up to speed on what she was working on every week.[97] Where things

---

[93]   *Id.* at 106:21-108:13. Of course, she also testified that she was working even when she wasn't doing computer-based work. *Id.* at 125:15-128:15.

[94]   Pl.'s Resp. to Defs.' Statement of Fact (Doc. 24) ¶ 13.

[95]   Ex. 2 to Defs.' Mot. for Summ. J. (Doc. 19-2) at 164:22-165:4.

[96]   *Id.* at 165:5-13.

[97]   Dep. of Leah Zornes (Doc. 53) at 95:18-24.

went smoothly, she basically acted on her own without direction.[98]  She would consult him if there was a particular problem, if something important or out of the ordinary arose, or if a strategic decision needed to be made.[99]  Mr. Thompson was her only manager and she reported directly to him.[100]  She acknowledged that he did not micromanage her.[101]  Mr. Thompson also did not require Ms. Zornes to meet any particular dollar quotas, targets, or objectives for her work.[102]

## Legal Analysis

Ms. Zornes alleges that Defendants failed to pay her overtime wages in violation of the FLSA and AMWA.  The FLSA, codified at 29 U.S.C. § 207, requires employers to pay employees overtime wages no less than one and one-half (1.5) times their regular rate of pay.[103]  The AMWA requires the same under state law.[104]

"An employee who sues for unpaid overtime 'has the burden of proving that [s]he performed work for which [s]he was not properly compensated.'"[105]  But there's a potential twist

---

[98]   *Id.* at 95:3-97:15, 121:12-122:11.

[99]   *Id.* at 95:3-97:15.

[100]   *Id.* at 97:21-25.

[101]   *Id.* at 95:3-97:15.

[102]   Ex. 2 to Defs.' Mot. for Summ. J. (Doc. 19-2) at 114:1-24.

[103]   29 U.S.C. § 207(a)(1).  The FLSA contains exemptions from this requirement.  Although the Amended Complaint alleged that Defendants "misclassified" Ms. Zornes as exempt from the FLSA, the parties did not discuss this in their briefs.  Defendants raised in their Answer the affirmative defense that Ms. Zornes was a highly compensated employee under 29 C.F.R. § 541.601.  Thompson Transportation's Answer (Doc. 17) ¶ 50; Expedite and Jimmy Thompson's Answer (Doc. 18) ¶ 50.  The only time Defendants mention this potential defense again is an allusion to it in their Motion for Summary Judgment to say that Defendants did not track Ms. Zornes's hours because she earned over $100,000 annually and because Defendants did not believe she worked more than forty hours per week.  Defs.' Br. in Supp. of Mot. for Summ. J. (Doc. 20) at 5.  Defendants do not cite to the highly compensated employee exception in that section.  Nor do they argue it or explain it in the rest of their summary judgment briefing.  Defendants could have, but did not, explain why Ms. Zornes was or should have been considered exempt as a highly compensated employee.  It was their burden to do so.  Accordingly, the Court will proceed with considering Ms. Zornes as a non-exempt employee for purposes of the Summary Judgment Motion.  The Eighth Circuit instructed in *Holaway* that a court need not determine whether an employee was properly or improperly classified as exempt when she fails to put forth sufficient evidence to demonstrate that she ever worked more than forty hours.  771 F.3d at 1059.

[104]   ARK. CODE ANN. § 11-4-211.

[105]   *Holaway*, 771 F.3d at 1059 (quoting *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 686-87 (1946)).

14

to this rule that deserves brief discussion.  Section 211(c) of the FLSA tasks employers with tracking and recording their employees' work time.[106]  Based on this statutory requirement, the United States Supreme Court and the Eighth Circuit have made clear that when an employer fails to keep wage and hour records, employees cannot be denied recovery because the precise extent of their work cannot be proven.[107]  In such circumstances, an employee can recover for worktime "if [s]he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference."

This Court has previously explained in *Thompson v. DiMichele Enterprises, Inc.* that the relaxed evidentiary standard is about proof of damages, not proof of liability:

> First, the Eighth Circuit precedent is clear that the "relaxed standard" in *Anderson* is not used for proving liability. Rather, *Anderson* relaxed the standard of proof needed to prove "the amount of damages."  Indeed, the Court in *Anderson* went out of its way to make clear that a relaxed standard of proof only applied "assuming that the employee has [already] proved that he has performed work and has not been paid in accordance with the statue."  The "relaxed standard" applies in determining "the extent of the damages[,]" not the "fact of damage[s]."  To determine liability, the standard of proof is always the same: the employee must prove by a preponderance of the evidence that he performed uncompensated work.[108]

In any event, even if the relaxed standard applied to proving liability, it would not matter in this case.  Ms. Zornes does not provide any evidence that would allow a reasonable jury to rationally conclude she established the existence of any uncompensated overtime work as a matter of just and reasonable inference.  Indeed, this case is a pretty close fit with *Holaway v. Stratasys, Inc.*,

---

[106]  29 U.S.C. § 211(c).

[107]  *Anderson*, 328 U.S. at 687; *Dole v. Alamo Foundation*, 915 F.2d 349, 351 (8th Cir. 1990).

[108]  No. 4:18-CV-00903-LPR, 2020 WL 1285040, at *6 (E.D. Ark. Jan. 3, 2020) (internal citations omitted).

where the Eighth Circuit affirmed a district court's grant of summary judgment for the defendant.[109]  The Court cannot justify reaching a different conclusion here.

A plaintiff employee can satisfy her evidentiary burden in different ways, such as records and testimony.[110]  But relying "mainly just [on] recollections of [her] daily activities" does not suffice—at least where those recollections are general and vague.[111]  A plaintiff employee must provide a meaningful and consistent explanation for her estimate of hours worked as well as "details which would allow a jury to determine"  that the plaintiff employee worked the claimed overtime.[112]  She must provide some specific information, such as "specific dates worked, specific hours worked, or money owed."[113]  "[W]ithout record evidence of a single hour worked over forty hours that did not receive overtime wages . . . unsupported estimations of the unpaid hours due are not enough."[114]  And, of course, to succeed on an overtime claim, the employee must also show that her employer knew, or should have known, that she was working the claimed overtime.[115]

As to the time period before Ms. Zornes was given a laptop to allow her to work remotely, Ms. Zornes has provided **no** evidence aside from her vague, general, and somewhat contradictory recollection regarding how many hours she worked.  As to the time period after Ms. Zornes was

---

[109]  771 F.3d 1057, 1057 (8th Cir. 2014).  Defendants liken the present case to this Court's decision in *DiMichele,* 2020 WL 1285040, at *1.  But there is a key difference between *DiMichele* and Ms. Zornes's case.  In *DiMichele*, the employer maintained precise time records for all of its employees that showed when they clocked in and when they clocked out, so *DiMichele* is not the best guide for Ms. Zornes's case where Defendants did not track her hours.

[110]  *See Mumbower v. Callicott*, 526 F.2d 1183, 1186 (8th Cir. 1975).

[111]  *Holaway*, 771 F.3d at 1058.

[112]  *Id.* at 1060.  If the employee can meet her burden, then the burden shifts to the employer to put forth evidence of the precise amount of work by the employee that negates the "reasonableness of the inference to be drawn from the employee's evidence." *Anderson.*, 328 U.S. at 687-88.

[113]  *Carmody v. Kan. City Bd. of Police Comm'rs*, 713 F.3d 401, 407 (8th Cir. 2013).

[114]  *Id.*

[115]  *Hertz v. Woodbury Cty., Iowa*, 566 F.3d 775, 781 (8th Cir. 2009); *see also Reich v. Stewart*, 121 F.3d 400, 407 (8th Cir. 1997).  "The FLSA's standard for constructive knowledge in the overtime context is whether" the employer should have known.  *Hertz*, 566 F.3d at 782.

given a laptop to allow her to work remotely,  Ms. Zornes did provide some record evidence aside from her recollections.  But it doesn't create a genuine dispute of material fact that is necessary to survive summary judgment.

First, as detailed above at pages 10-11, there is one text message sent after hours in 2018 between Mr. Thompson and Ms. Zornes.[116]  But there is nothing to suggest that her late-night work on that occasion put her over forty hours for the week.  At most, the text evidences one instance of Ms. Zornes working after regular business hours and  Mr. Thompson having knowledge of Ms. Zornes doing so.  However, there is no other information about the total amount of work Ms. Zornes did that day or that week to suggest that this was an instance of deserved-but-unpaid overtime.

Indeed, it is worthwhile to consider here the computer log-in records that evidence when Ms. Zornes logged in to her work desktop and how long she stayed connected.[117]  The day of the after-hours text was October 28, 2018.  There is no record of Ms. Zornes logging in to her work computer that day.[118]  The following day, October 29, 2018, Ms. Zornes spent a total of fifty-five (55) minutes logged in to her work desktop.[119]  Ms. Zornes testified that she could do some, but not all of her work, by phone.[120]  She needed computer access to complete her responsibilities.[121] As a result, the single text message exchange on the evening of October 28, 2018 is not sufficient evidence to show that Ms. Zornes worked uncompensated overtime that week.  In fact, in the week

---

[116]   Ex. 6 to Defs.' Mot. for Summ. J. (Doc. 19-6) at 5.

[117]   Ex. 4 to Pl.'s Resp. in Opp'n to Defs.' Mot. for Summ. J. (Doc. 23-4).

[118]   *Id.* at 11.

[119]   *Id.*

[120]   Ex. 2 to Defs.' Mot. for Summ. J. (Doc. 19-2) at 126:12-128:15.

[121]   *Id.*

of October 21-27, 2018, Ms. Zornes was logged in to her remote desktop a total of 4.05 hours.[122]
The week of October 28 to November 3, 2018, Ms. Zornes was logged in to her remote desktop
for a total of 2.27 hours.[123]

Aside from Ms. Zornes's recollections, and the one text message, the computer log of Ms.
Zornes's log-ins from her laptop is the only record evidence touching upon hours worked.  The
computer log spans from December of 2017 to May of 2019.  It shows the time when Ms. Zornes
logged in to her work desktop from her laptop and the duration of the connection.  But, as discussed
in the factual background section above, the computer record doesn't show any work over forty
hours a week.  At most, the computer logs are evidence that, after Ms. Zornes was given a laptop
to allow her to work from home instead of coming into the office every day, she sometimes did
work early in the morning or late at night.  But there is no documentary evidence to suggest that
such worked pushed her over forty hours a week in any week of her employment, let alone all
weeks of her employment.  This is especially important given that Ms. Zornes was not coming into
the office on a daily basis during this time, and that she and/or her husband were sick during this
time period.

The time log shows that from December 1, 2017 to May 19, 2019, Ms. Zornes spent an
average of 7.39 hours per week logged in to her work desktop computer.[124]  This computer data
(even in combination with Ms. Zornes's testimony and the single text message) is not enough for
Ms. Zornes to carry her burden of showing a just and reasonable inference that she worked
uncompensated overtime.  No reasonable jury could rationally find otherwise.  Ms. Zornes alleges

---

[122]   Ex. 4 to Pl.'s Resp. in Opp'n to Defs.' Mot. for Summ. J. (Doc. 23-4) at 11.

[123]   *Id.*

[124]   *Id.* at 1-22. The Court took the time sum of each week and divided it by the total number of weeks accounted for by this log.

that she spent a lot of time on the phone for her job but provided no phone records.  Without more evidence, it would not be reasonable to infer that she spent on average over thirty-three (33) hours a week on the phone when significant portions of her job entailed computer work.

In short, Ms. Zornes has failed to provide evidence from which a reasonable jury could rationally conclude that she worked over forty hours a week and reasonably determine the amount and the extent of her overtime work as a matter of just and reasonable inference.[125]  While it is true that, as a general matter, a plaintiff's testimony alone can supply the necessary evidence to survive summary judgment, Ms. Zornes's testimony is too vague, too general, and too contradictory to do so under the Eighth Circuit's standard.  This is certainly the case where, as here, Ms. Zornes did not provide the Court with the very documentary evidence that she claims would clearly show her work outside normal business hours—the cell phone records.

As noted above, but worth mentioning again, this case resembles *Holaway v. Stratasys, Inc.*, where the Eighth Circuit affirmed a district court's grant of summary judgment for the defendant.[126]  Mr. Holaway worked from home and traveled to work-site locations.  He testified that he typically worked sixty (60) to seventy (70) hours per week "based on mainly just recollections of his daily activities."[127]  Mr. Holaway "estimated his work hours as between forty-five and seventy hours a week, yet has failed to specifically account for the hours worked."[128]  Similarly, here, Ms. Zornes relied on her recollections of her activities, but failed to specifically account for the hours she claimed that she worked.  And while the contradictions in her testimony

---

[125] *Holaway*, 771 F.3d at 1060.

[126] *See supra*, footnote 109.

[127] *Holaway*, 771 F.3d at 1058.

[128] *Id.* at 1059-60.

may not be as egregious as the ones in *Holaway*, they further devalue Ms. Zornes's recollected testimony.[129]

### Conclusion

Defendants' Motion for Summary Judgment is GRANTED in its entirety and judgment is entered for Defendants on all claims.  Defendants' Motion in Limine is DENIED as moot.[130]  Ms. Zornes's Motion in Limine is DENIED as moot.[131]

IT IS SO ORDERED this 2nd day of November 2020.

_____
LEE P. RUDOFSKY
UNITED STATES DISTRICT JUDGE

---

[129]   Because Ms. Zornes has not met her burden with respect to showing she worked overtime hours, the Court need not analyze whether Defendants knew or should have known about any uncompensated overtime work.

[130]   Defs.' Mot. in Limine (Doc. 39).

[131]   Pl.'s Mot. in Limine. (Doc. 41).